**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JESSIE WILLIAMS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 13 C 04120 |
| | ) | |
| KAREN JAIMET, | ) | Judge John J. Tharp, Jr. |
| | ) | |
| Respondent. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Jessie Williams was convicted by a jury of felony murder and sentenced to 43 years in prison for that crime. Resp. Ex. A at 175; *People v. Williams*, No. 1-08-0907, 2011 WL 9548458, at *1 (Ill. App. Ct. Mar. 7, 2011). He now petitions for a writ of habeas corpus under 28 U.S.C. § 2254. In his *pro se* petition, Williams contends that his rights under the Sixth and Fourteenth Amendments were violated when the state elicited, and used in closing argument, testimony implying that his non-testifying co-defendants had implicated him. Williams alleges this testimony violated *Bruton v. United States* and *Crawford v. Washington*. For the reasons set forth below, the Court denies the petition for a writ of habeas corpus and declines to issue a certificate of appealability.

**I. Background**

When a federal habeas petitioner is in custody pursuant to a state court adjudication, the state court's factual findings are presumed to be correct unless the petitioner rebuts that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Thompkins v. Pfister*, 698 F.3d 976, 983 (7th Cir. 2012). Williams has not alleged any factual errors by the state court. Therefore, the following facts are primarily drawn from the state appellate court opinion. *People*

*v. Williams*, No. 1-08-0907, 2011 WL 9548458 (Ill. App. Ct. Mar. 7, 2011) ("*Williams*"). Facts not mentioned in the state court's opinion are taken from the transcripts of the state court proceedings.

**A. The Murder**

On April 17, 2003, Carl Mays, Donnell Mersier, and Ricardo Garr drove together from Detroit to Chicago to engage in a scheme to cash money orders illegally through currency exchanges.[1] *Williams* at *1. The men drove to the intersection of 63rd Street and Loomis Boulevard to recruit people to help them with the scheme. *Id*. Jessie Williams ("Williams"), along with Eric Williams ("Eric") and Perry Higgins, approached Mays to participate in the scheme. *Id*. Mays turned away Williams and Eric as being too young. *Id*. Mays successfully recruited Higgins as well as two women named Diane and Felicia. *Id.* at *2.

That night, after the crew had obtained thousands of dollars from currency exchanges in the area, Williams and Eric robbed Garr, Mays, and Mercier when they returned to the area around 63rd and Loomis. Shortly after dropping off Diane, Felicia, and Higgins, Garr pulled over because Mersier was trying to make a phone call but was having trouble getting a signal on his cell phone. *Id*. Mays was sitting in the front passenger seat. *Id.* While the trio was parked on 63rd Street, Eric knocked on the front passenger window of the van and then opened the front passenger side door while Williams opened the side doors. *Id*. Eric produced a gun and demanded money from the van's occupants. Williams reached into Mersier's pockets and removed money, while Eric took money from Mays. *Id*. Eric attempted to order Mays out of the car, hitting him with the gun, while Williams stood next to him. *Williams* at *2. Mersier moved

---

[1] The description of this scheme in the appellate court opinion is somewhat sketchy, but the particulars of how the scheme operated are not material to the evaluation of Williams' petition.

across the seat and hit Eric in the face. *Id*. Eric fired one shot at Mersier, hitting him in the chest. *Id*. Eric and Williams then ran away. *Id*. Garr and Mays drove Mersier a hospital but he died of the gunshot wound. *Id.* at *2. After dropping Mersier at the hospital, Garr and Mays drove back to Detroit.

Police in the area heard the gunshot and gave chase to two men. One, later determined to be Williams, escaped but police caught Eric. Subsequent investigation (more on this in a moment) led them to Williams, who was arrested on June 4, 2003. *Id.* at *4. Williams was tried for first degree murder and armed robbery.[2]

### B. The Trial

A number of witnesses testified at trial against Williams. Mays and Garr both testified in exchange for not being prosecuted for the money order scheme. *Williams* at *2. They testified in detail about the events of that day, including the shooting. Mays further testified that, two days after the shooting, he identified Williams in a photograph array. *Id*. Garr identified Williams in a lineup on June 6, 2003, shortly after Williams' arrest. *Id.* at *4. Diane Perkins, one of the recruited participants in the scheme, testified that she saw Williams standing outside the van, saw him go in and out of the van, and heard a gunshot from the direction of the van. *Id.* at *3. Diane admitted at trial that she did not mention the gunshot or Williams until her second interview with police. *Id*. Police officer Leroy Horton further testified that he had been on patrol the night of the murder and had heard a gunshot and seen two men backing away from a white van. *Id*. He was

---

[2] The record reflects that Eric Williams and Perry Higgins were "codefendants," but they were not tried with Jessie Williams. The appellate court opinion provides no information about Higgins' role in the robbery and murder. It appears from various exchanges during the trial, however, that the state' theory was that, after participating in the money order scheme during the day, Higgins related information to the other two defendants about how much money Mays, Garr, and Mersier had made during the day and assisted them in planning the robbery.

able to generally describe the height, build, and complexion of the men he saw. Finally, a forensic scientist testified that a palm print found on the van matched Williams' palm print. Resp. Ex. H at 32.

The argument Williams advances in his petition comes from an exchange between the prosecutor and Detective Timothy O'Brien. O'Brien interviewed Eric several times after he was arrested and was responsible for much of the investigation of the murder. *Williams* at *3-4. The challenged testimony proceeded as follows:

> Q: And did you have occasion to speak with Eric Williams at the temporary headquarters of Area One at that time?
>
> A: Several occasions.
>
> Q: Now, at some point approximately four o'clock in the morning, did you leave Area One?
>
> A: Yes.
>
>    * * *
>
> Q: Where did you go?
>
> A: The vicinity of 63rd and Loomis, 6351, if I'm not mistaken.
>
>    * * *
>
> Q: Why did you go to that location?
>
> A: To look for some individuals.
>
> Q: And did you have the name of the person you were looking for?
>
> A: I had nicknames of Flash and Elbow.
>
> Q: Did you in fact locate the person who answers to the nickname of Flash at that location?
>
> A: Yes.
>
>    * * *

Q: Subsequent to speaking with Flash, did you have a conversation with Eric Williams at approximately eight o'clock that morning?

A: Yes.

Q: And after speaking with Eric Williams, did you have occasion to locate a picture?

A: Yes.

Q: And of whom – whose picture did you locate at that time?

A: Picture of the Defendant, Jessie Williams.

Q: Do you see Jessie Williams in court today?

A: Yes.

Q: Would you point him out and describe what he is wearing?

A: Sitting to the right of defense Counsel in a white shirt and tie.

Q: Subsequent to that, did you have a conversation with Eric Williams?

A: Yes.

Q: After that, what did you do? After that conversation with Eric Williams, what did you do?

A: Left the area. Attempt to locate Mr. [Jessie] Williams.

Resp. Ex. H at 74-75. Williams' attorney did not object to this testimony when it was offered or request a limiting instruction to the jury.

Later in his testimony, O'Brien referred to a second exchange with a witness, this time Perry Higgins:

Q: On April 29th, did you have occasion to have a conversation with Perry Higgins at Area One, the temporary headquarters?

A: Yes.

Q: As of that time you had not located Jessie Williams, is that correct?

A: That's correct, we had not.

Q: You had not located him by May 4th?

A: That's correct.

Q: May 4th did you do anything to broaden the number of people who were looking for Jessie Williams?

A: Yes.

[Defendant's counsel objected this had been asked and answered, the judge instructed the prosecutor to rephrase the question.]

Q: What did you do on April 4th [sic] with regard to locating Jessie Williams?

A: An investigative alert was issued for the arrest of Jessie Williams.

Resp. Ex. H at 78.

Williams' lawyer had moved *in limine* before O'Brien's testimony to exclude it on Confrontation Clause grounds, but the motion was denied as to the "non-hearsay purpose of explaining what it is that the officers did." Resp. Ex. A at 81; Resp. Ex. I at 101-102. After the jury went to lunch, Williams' lawyer renewed her objections to O'Brien's testimony and moved for a mistrial. Resp. Ex. H at 124-27. The judge denied the motion for a mistrial, finding "in light of all the evidence that I heard in this case that that is not prejudicial to your client." *Id.* at 127.

These exchanges were not referred to by the prosecution in its initial closing argument. During the defense closing argument, Williams' attorney argued that there was no credible evidence that Jessie Williams was Eric Williams' accomplice during the robbery of Garr, Mays, and Mersier. During her rebuttal argument, the prosecutor responded by telling the jury:

> There are a lot of things that you can derive reasonable inferences from as to the conduct of all these individuals who committed this crime. Eric Williams was arrested, and he was arrested with a gun. . . . But Eric Williams who had the gun, they talked with him when he was brought over to area one. And it is amazing, ladies and gentlemen, that at about 4 o'clock in the morning, after talking with Eric Williams, Detective Struck and Detective O'Brien are able to get in their police car. And where did they go? They went to the 6300 block of South Loomis. Isn't

that amazing? The place where this all jumped off, the place where this all started. And who are they looking for when they go there? They are looking for Flash, and they find him. And he talks to them. He talks to them at that location. He comes to area one and he talks to them. And after they talk to Flash . . . they talk to Eric Williams again. And after they talk to Eric Williams again, Detective O'Brien went and got himself a picture, and who did he get a picture of? Before he had the statements of Ricardo Garr and Carl Mays, he got a picture of him [Jessie Williams]."

Resp. Ex. I at 87. Williams' lawyer objected, at which point the judge reminded the jury that "[c]losing arguments are to be confined to the evidence that you've heard and the reasonable inferences to be drawn from that evidence."[3] *Id*. at 88. The prosecutor then continued:

After they get a picture, after Detective O'Brien gets a picture of the defendant, he goes back and talks to Eric Williams. And after that he starts looking for, guess who? Him. [Jessie Williams]."

*Id*.

After arguments had been completed, Williams' attorney once again objected and moved for a mistrial, arguing that "the undeniable inference" the prosecutor was asking the jury to draw was that Eric Williams had identified Jessie Williams as the other participant in the robbery. The prosecutor responded by arguing that the state had elicited no testimony about statements made by Eric Williams, that the detectives had also talked to "Flash," and that O'Brien's testimony "showed the course of the investigation, what the officers did." *Id*. at 99. The trial judge denied the mistrial motion, stating:

When I ruled on the motion in limine, I ruled that the State could bring out the course of conduct within certain limitations, understanding that the defendant has the right to confront witnesses, as well as hearsay. I would not allow any substance of any conversations alleged to be taken but only for the non-hearsay purpose of explaining what it is that the

---

[3] The judge had also informed the jury prior to closing arguments that "[w]hat the lawyers say during the argument is not evidence and should not be considered by you as evidence." Resp. Ex. I at 33.

officers did. After hearing Detective O'Brien's testimony, I ruled that the defendant was not prejudiced to the extent that a motion for mistrial would be granted based on his testimony. After hearing the closing argument, the position of the defendant is that the only inference that could be made was that there was a conversation, and that conversations by those witnesses that the defendant could not confront pointed to the identification of the defendant. . . . [B]ased on the argument that I have heard and the evidence that I have heard, I find that the comments and the argument of the State during the rebuttal argument is not prejudicial enough to warrant the granting of the defendant's motion for a mistrial.

*Id*. at 96-103.

The jury convicted Williams of all counts (that is, of the armed robbery of Mersier and Mays and of the first-degree felony murder of Mersier). *Williams* at *4.[4] The state court merged the armed robbery convictions into the murder conviction and then sentenced Williams to 43 years in prison. *Id*. Williams filed a timely state court appeal, including his present claim that his Sixth and Fourteenth Amendment rights were violated by O'Brien's testimony under the Confrontation Clause. *Id.* at *8. The state court found Williams had sufficiently preserved the issue for appeal by making a motion *in limine* and the post-trial motion. *Id*. Proceeding to the merits, the appellate court rejected Williams' claims on the ground that the testimony "showed the course of the police investigation and, therefore, did not constitute hearsay." *Id.* at *9. As to the prosecutor's closing argument, the appellate court found one of the remarks had not been properly preserved for appeal and the other was proper because prosecutors have "great latitude in making their closing arguments." *Williams* at *10. Finally, the appellate court found that even if either of the trial court's rulings with respect to the prosecution's rebuttal argument had been

---

[4] The Respondent's brief erroneously states at page 1 that Williams was convicted following a bench trial. See Resp.'s Answer at 1, ECF No. 14. The brief otherwise acknowledges, however, that the trial was by jury.

erroneous, the error was harmless in the face of the "overwhelming evidence" against Williams and the proper jury instructions. *Id*.

Williams filed a timely petition for leave to appeal to the Illinois Supreme Court raising the Confrontation Clause issue. Resp. Ex. R at 13-16. The Illinois Supreme Court denied the petition without analysis on May 25, 2011. Resp. Ex. S.[5] Williams filed for state post-conviction relief on April 20, 2012 on grounds unrelated to this petition. Resp. Ex. K at 12, 48-87.[6] That petition was denied on July 12, 2012 and appealed on August 13, 2012. Resp. Ex. K at 145, 151.[7] The appellate court affirmed the judgment denying post-conviction relief on December 13, 2013. Williams did not file a petition for leave to appeal to the Illinois Supreme Court. Williams filed the current federal habeas petition on June 3, 2013, while his post-conviction appeal was pending.[8]

---

[5] The Respondent's brief erroneously states that the PLA was denied on May 5, 2011.

[6] Williams' post-conviction petition may have been untimely. In non-death penalty cases in Illinois, a post-conviction appeal must be filed within 6 months of completion of any proceedings in the United States Supreme Court or the date by which a petition for certiorari would be due (that is, 90 days after completion of the state court appeal). See 725 ILCS 5/122-1(c); Sup. Ct. R. 13 (petition for certiorari due within 90 days). Williams' filed his post-conviction petition on April 20, 2012, almost 8 months after the period for filing a petition for certiorari in the United States Supreme Court had run on August 22, 2011. The post-conviction court, however, did not reject the petition on grounds of timeliness; rather, it addressed the petition on the merits. Accordingly, the Respondent cannot assert that the petition did not toll the running of the federal habeas limitations period, and the Respondent did not advance that argument in opposition to the petition.

[7] Thus, the appeal may have been untimely as well. See 725 ILCS 5/122-7; Ill. S. Ct. Rule 303(a) (30 days to appeal from Circuit Court final order). Again, however, the state appellate court did not reject the appeal of the denial of the post-conviction petition on the ground that it was untimely, so the habeas limitation period must be considered to have remained tolled until the state court post-conviction proceedings ended on appeal in December 2013.

[8] As noted, at that time, only about 8 months of the one-year federal habeas limitations period had run. Accordingly, Williams' petition in this Court is timely. Action on Williams' petition in this Court was deferred pending confirmation of the completion of his state court post-conviction proceedings.

## II. Analysis

Williams' petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254. Under AEDPA, Williams must show that he is "in custody in violation of the Constitution or laws or treaties of the United States" and that the last state court adjudication on the merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2554(a), (d)(1). The law under which the state court's decision is measured is "the law of the Supreme Court at the time of the last state court decision on the merits," meaning the law in March 2011 when the Illinois appellate court rendered its decision. *Goodman v. Bertrand*, 467 F.3d 1022, 1027 (7th Cir. 2006). In order to grant the petition, the state court's application of Supreme Court precedent must have been "objectively unreasonable" – more than merely "incorrect or erroneous." *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003). This test is "highly deferential" and "demands that state court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). And even if Williams is able to prove a constitutional error, he must also demonstrate the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). In other words, Williams must prove any error was not harmless.

Respondent Harrington[9] raises four arguments in response to Williams' petition. First, Harrington argues that O'Brien's testimony was not hearsay because it did not reveal the substance of the conversations, and therefore could not violate Williams' rights under *Crawford*. Second, Harrington argues that the state court did not unreasonably apply *Bruton* because there

---

[9] Following the briefing of the petition Karen Jaimet became the warden at Williams' place of incarceration. The Court refers to Harrington throughout because he was the warden during the briefing of this case.

was not a joint trial and because the substance of the statements was not revealed. Third, he argues that any constitutional error was harmless – both that the state court reasonably applied the harmless error standard and that the error was in fact harmless under *Brecht*. Finally, Harrington argues no certificate of appealability should be issued. Because the error was harmless, this Court denies the petition and declines to issue a certificate of appealability.

### A. *Crawford* and *Bruton*

This Court addresses the *Crawford* and *Bruton* issues together, as they were framed as a single Confrontation Clause claim in the petition and are so deeply intertwined that addressing them separately would be needlessly repetitive. *Crawford* and *Bruton* both protect a criminal defendant's Sixth Amendment right to "be confronted with the witnesses against him" and to cross-examine those witnesses. U.S. Const. Amend. VI.[10] Per *Crawford v. Washington,* 541 U.S. 36 (2004), the Confrontation Clause of the Sixth Amendment bars out-of-court testimonial statements (also known as "testimonial hearsay") unless the defendant had a prior opportunity to cross-examine the declarant and the declarant is unavailable to testify. See also *Jones v. Basinger*, 635 F.3d 1030, 1041 (7th Cir. 2011); *United States v. James*, 487 F.3d 518, 525 (7th

––––––––––––––––––––

[10] Harrington argues that *Bruton* is inapplicable because Williams was not tried jointly with Eric, although Eric was discussed repeatedly during the trial and known by the jury to be a co-defendant. But the rationale of *Bruton* applies nevertheless. *Douglas v. Alabama*, a foundational case to the Supreme Court in *Bruton*, was not a joint trial case (merely the introduction of the statement of an accomplice). 380 U.S. 415, 419 (1965). And the Supreme Court has discussed the principles of *Bruton* and *Douglas* in cases with similar facts to the present case that were not joint trials. *See Lee v. Ill.*, 476 U.S. 530, 542 (1986). Further, the Seventh Circuit has invoked *Bruton* to demonstrate unreasonable applications of *Crawford* involving the introduction of out-of-court statements by an accomplice who was not tried with the defendant. *See, e.g., Jones v. Basinger,* 635 F.3d 1030, 1037-38 (7th Cir. 2011). Although the Supreme Court has indicated a separated trial cannot "strictly speaking" yield a *Bruton* violation, such trials can still create Confrontation Clause violations stemming from the same reasoning. *See Lee,* 476 U.S. at 542. This case is no different in this respect, and the mere fact the trial was not joint does not warrant dismissing *Bruton* entirely.

Cir. 2007). For that reason, out-of-court confessions by a non-testifying codefendant cannot be introduced as evidence against a defendant at trial. *Bruton v. United States*, 391 U.S. 123, 126 (1968). However, the Sixth Amendment does not bar out-of-court statements when they are not offered to prove the truth of the matter asserted; thus, the Sixth Amendment poses no bar to the admission of non-hearsay statements. *See Crawford,* 541 U.S. at 60 n. 9 (2004); *James,* 487 F.3d at 525; *United States v. Van Sach,* 458 F.3d 694, 701 (7th Cir. 2006); *United States v. Tolliver,* 454 F.3d 660, 665 (7th Cir 2006). When out-of-court statements are not offered to prove the truth of the matter asserted, the Confrontation Clause is satisfied if the defendant had the opportunity to cross-examine the person repeating the out-of-court statement. *See Tennessee v. Street,* 471 U.S. 409, 414 (1985).

Although the full scope of what the Court meant by "testimonial" was not detailed in *Crawford*, one category was highlighted as being unquestionably testimonial: "[s]tatements taken by police officers in the course of interrogations" *Crawford,* 541 U.S. at 52. There is no question here that O'Brien was a police officer and that the statements he received from Eric and Higgins were taken in the course of interrogation. The question, then, is whether O'Brien's testimony can fairly be said to have introduced hearsay statements, since any such statements are clearly testimonial. This inquiry turns on whether the testimony sought to put before the jury statements by Eric Williams and Perry Higgins that were offered for their truth. At trial, the state defended the testimony and arguments about O'Brien's interviews with Eric Williams and Higgins by maintaining that the evidence was relevant to show the course of the police investigation, and in holding that there was no Confrontation Clause violation, the appellate court placed great weight on the fact that the testimony at issue "showed the course of the police investigation and, therefore, did not constitute hearsay." *Williams,* 2011 WL 9548458, at *9.

There is no question that the "course of investigation" rationale can, in some circumstances, justify the admission of what would otherwise be hearsay statements, as the Seventh Circuit has repeatedly confirmed:

> When the reasons for the police's actions are relevant, a witness can testify about what information prompted those actions. That is, when such a statement is offered only to show the effect it had on the police, it is used for a purpose other than the truth of its contents. E.g., *United States v. Eberhart,* 434 F.3d 935, 939 (7th Cir.2006) (testimony is not for its truth where it is offered "only as an explanation of why the investigation proceeded as it did"). We have applied this "course of investigation" rationale in several cases to permit the government to introduce brief out-of-court statements designed to "bridge gaps in the trial testimony that would otherwise substantially confuse or mislead the jury." See *Jones v. Basinger,* 635 F.3d 1030, 1046 (7th Cir.2011) (collecting cases). This approach is consistent with the Confrontation Clause, which "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." See *Crawford,* 541 U.S. at 59 n. 9, 124 S.Ct. 1354; *United States v. Gaytan,* 649 F.3d 573, 579 (7th Cir.2011) (testimonial statements of a witness did not violate the Confrontation Clause, because they "were not offered for their truth").

*Carter v. Douma*, 796 F.3d 726, 736–37 (7th Cir. 2015); *United States v. Dodds*, 569 F.3d 336, 341 (7th Cir. 2009) (no confrontation violation where out-of-court witness statement "was not admitted for its truth-that the witness saw the man he described pointing a gun at people-but rather to explain why the police proceeded to the intersection of 35th and Galena and focused their attention on [defendant], who matched the description they had been given. This was a permissible, non-hearsay purpose."); *United States v. Breland,* 356 F.3d 787, 792 (7th Cir. 2004) ("the introduction of out-of-court statements when offered as background information to put an officer's actions in context because they are not being offered for the truth of the matter asserted").

It is not enough, however, for a court to merely accept at face value the prosecution's mantra that out-of-court statements are being offered not for their truth but to explain the "course

of conduct" by law enforcement; the reality must match the theory. *See, e.g., United States v. Walker*, 673 F.3d 649, 657–58 (7th Cir. 2012) (government cannot hide "behind its asserted needs to provide 'context' and relate the 'course of investigation.' These euphemistic descriptions cannot disguise a ploy" to introduce out-of-court statements by others as evidence of a defendant's guilt). As the Seventh Circuit went on to explain in *Douma*:

> The problem, as we have explained time and again, is that the "course of investigation" gambit is so often abused and/or misunderstood that it is an evidentiary and constitutional minefield. See, e.g., *Jones,* 635 F.3d at 1046; *United States v. Silva,* 380 F.3d 1018, 1020 (7th Cir.2004) ("Allowing agents to narrate the course of their investigations, and thus spread before juries damning information that is not subject to cross-examination, would go far toward abrogating the defendant's rights under the sixth amendment and the hearsay rule."). To convict a defendant, after all, the prosecution does not need to prove its reasons for investigating him. *United States v. Mancillas,* 580 F.2d 1301, 1310 (7th Cir. 1978). When the prosecution offers out-of-court statements of non-witnesses on the theory they are being offered to explain "the course of the investigation," it runs a substantial risk of violating both the hearsay rules of evidence and the Confrontation Clause rights of the defendant under the Sixth Amendment. Both defense counsel and trial judges need to be on high alert when the prosecution offers what sounds like hearsay to explain "the course of the investigation."

796 F.3d at 737.

When it comes to assessing the purpose for which a statement is offered, whether reality matches theory is a question of fact, not law. *See Jones*, 635 F.3d at 1042; *United States v. Rea,* 621 F.3d 595, 604 (7th Cir. 2010) (applying clear error standard when reviewing factual predicates to district court's hearsay ruling). That said, it is an objective inquiry, "based on all of the circumstances attendant to the offer of a particular statement into evidence," *Jones* at 1042 n.2, and it is a preliminary determination of admissibility that is made by the court, not by the jury, *see* Fed. R. Civ. P. 104(a). In the context of a habeas petition, however, a federal district court is bound by the state appellate court's conclusion that an out-of-court statement was

offered not for its truth, but to show law enforcement's "course of conduct"—unless there is clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1); *Jones*, 635 F.3d at 1042.

There is. The state appellate court held that "Detective O'Brien's testimony regarding [Eric] Williams and Higgins . . . showed the course of the police investigation and, therefore, did not constitute hearsay." *Williams*, 2011 WL 9548458, at *9. That finding was objectively unreasonable, for two principal, and related, reasons. First, the investigation's "course of conduct" was entirely irrelevant in this case. And second, the state did not argue that O'Brien's testimony was relevant to show the course of the investigation. It argued that the evidence was relevant to prove Williams' guilt.

As the Seventh Circuit noted in *Douma,* evidence about why the police did what they did during the course of an investigation is generally not relevant to a trial on criminal charges; the central question is whether there is evidence that proves the defendant's guilt, not how the government developed that evidence. "To convict a defendant, after all, the prosecution does not need to prove its reasons for investigating him." *Douma*, 796 F.3d at 736. The course of an investigation may become relevant to rebut defenses and theories advanced by the defendant— but here, the defense advanced no attack on the integrity or professionalism of the law enforcement officers who conducted the investigation; the defense offered no "accusation that the officers were officious intermeddlers staking out [the defendant] for nefarious purposes." *United States v. Silva*, 380 F.3d 1018, 1020 (7th Cir. 2004). It offered no "rush to judgment" argument, no claim that investigating officers were biased, or corrupt, or even just inept. To the contrary, the defense essentially stipulated to most of the evidence in the case, telling the jury in its closing that "there is really not a lot that's disputed in this case." Resp. Ex. I at 52.

Rather than impugn the investigation or the investigators, the defense challenged the credibility of "the con crew" witnesses (Garr, Mays, and Diane Perkins) who implicated Williams at trial, contending that they were lying about Williams' involvement to spare themselves from prosecution relating to the money order scheme. How or why Detective O'Brien learned of Williams' name, or obtained his photograph was therefore irrelevant. There was no gap in the evidence that would "substantially confuse or mislead the jury" about what the police were investigating. *Jones*, 635 F.3d at 1046. No reasonable court could have thought that the jury would be confused as to why police were looking for Williams and the defense did not in any way suggest that the police had no basis to do so. Several eye witnesses quickly came forward and identified Williams, including one during a photo array just days after the murder; the defense was that the witnesses lied, not that the police pursued Williams without any basis.

That the course of the investigation had no relevance is borne out by the fact that neither the trial court in its ruling on the defense objections to the state's arguments, nor the appellate court in its opinion, explained why it was relevant to know that O'Brien had interviewed Eric and Higgins during the investigation. And that omission brings us to the second reason that the appellate court's finding about the state's purpose in offering that evidence is clearly unreasonable: the state argued that it was evidence that Williams was guilty, not that it was evidence to explain some aspect of the investigation that the defense had challenged.

The argument using O'Brien's testimony about Eric and Higgins came just after the prosecutor explained that circumstantial evidence is proof of facts "which give rise to a reasonable inference of other facts, which tend to show the guilt or innocence of the defendant." Resp. Ex. I at 85. The prosecutor then proceeded to highlight the "amazing" coincidence that O'Brien learned information about Williams, and obtained his photograph, after talking to Eric.

As Williams' attorney argued in support of her mistrial motion, "the undeniable inference" that the prosecutor invited the jurors to draw was that as a result of what Eric and Higgins told Detective O'Brien, "that's why they went looking for Jessie Williams, that they I.D.'d him as being one of the individuals involved." *Id.* at 99. The prosecutor argued to the jury that O'Brien had evidence implicating Williams in the crime before he had learned that Garr and Mays had identified anyone; in other words, that there was evidence implicating Williams that was entirely independent of Garr and Mays. *Id.* at 87. That effectively told the jury: O'Brien knew from his interviews of Eric and Higgins that Williams was involved—an argument, plain and simple, that other witnesses (who did not testify) implicated Williams in the crimes. As such, it rests on the same rationale that was condemned in *Jones*, where the prosecution "admitted that it wanted 'to get into' the statement to show that 'other independent evidence' linked Jones to the killings." *Jones,* 635 F.3d at 1042. This argument cannot be explained or justified as a response to a defense argument that the witnesses who testified at trial were not credible; as the Seventh Circuit noted in *Jones*, were that to suffice, "any hearsay statement to police during the course of their investigation would be admissible whenever a defendant makes any comment on the evidence." *Id.* at 1048 (quoting state court dissenting opinion).

Perhaps in implicit acknowledgment that O'Brien's testimony about his interviews of Eric and Higgins cannot be justified on the basis of the "course of conduct" rationale, Respondent attempts to deny the state court's reliance on it. The state court, he maintains, "did not need to apply the course-of-investigation hearsay exception" because it had otherwise held no hearsay was involved because the prosecutor did not elicit any testimony from O'Brien about the statements relayed to him by Eric and Higgins. Resp. at 12 n. 1. This argument is simply not credible; it tortures the meaning of the state court's use of the term "therefore" in its statement

that the statements showed the course of investigation and **therefore** were not hearsay. *Williams*, 2011 WL 9548458, at *9. The state court noted the absence of testimony about the statements themselves not as an alternative ground for its ruling but as a factor relevant to its evaluation of whether O'Brien's testimony had been offered to show the course of the investigation.

In any event, that O'Brien never purported to repeat the words spoken by Eric or Higgins does not make the state court's finding that the testimony was offered to show "course of conduct" reasonable in light of the state's argument that the import of the testimony was derived from the implicit substance of the statements by the out-of-court witnesses. Hearsay may include implied assertions. *See, e.g.*, *United States v. Miller*, 547 F.3d 718, 720 (7th Cir. 2008) (receipts were hearsay if offered for the truth of the sellers' (implied) assertions that the parts had been delivered); *Velsicol Chem. Corp. v. Monsanto Co.*, 579 F.2d 1038, 1048 (7th Cir. 1978) (limiting consideration of reports that constituted "implicit hearsay"). Testimony about an out of court statement does not have to include an express recounting of the statement to constitute hearsay; where the testimony effectively conveys the substance of the out-of-court statement by some other means, the statement still constitutes hearsay if offered for the truth of what was asserted. The **type** of evidence introduced to prove the substance of the statement does not govern its admissibility; circumstantial evidence that a witness made a statement implicating the defendant (*e.g.*: "I asked who did it; after he answered my question, I arrested X") is no less problematic under the hearsay rule than direct evidence that the witness said "X did it." To be sure, a jury might not accord the same *weight* to this circumstantial evidence of the statement, given its inherent ambiguity, but an argument that the evidence is very probative is hardly an argument that supports its admissibility. If the jury can infer those words from context, then the statement is before the jury just as it would have been if testimony about the words themselves had been

offered. And if the party offering the statement does so to prove the truth of what the statement asserted, then it is hearsay.

Thus, numerous courts have found Confrontation Clause violations based on the introduction of testimony to establish, by implication, the substance of an out-of-court statement implicating a defendant in criminal conduct. *See, e.g.*, *Ocampo v. Vail,* 649 F.3d 1098, 1110 (9th Cir. 2011) ("testimony communicating the substance of absent witnesses' statements can run afoul of the Confrontation Clause even when there is no verbatim account of the out-of-court statement"); *United States v. Meises*, 645 F.3d 5, 21 (1st Cir. 2011) ("if what the jury hears is, in substance, an untested out-of-court accusation against the defendant . . . the defendant's Sixth Amendment right to confront the declarant is triggered"); *Ryan v. Miller*, 303 F.3d 231, 249 (2d Cir. 2002) ("If the substance of the prohibited testimony is evident even though it was not introduced in the prohibited form, the testimony is still inadmissible.").[11]

Indeed, the Second Circuit has addressed on several occasions precisely the tactic that the state employed during Williams' trial; that is, implying cause-and-effect from a sequence of interactions between investigators and witnesses. In *Ryan v. Miller*, *supra*, the court found held that the prosecutors had violated the Confrontation Clause through a series of questions implying that codefendants had implicated the defendant on trial during interrogations conducted during the course of the police investigation. In its opinion, the *Ryan* court also highlighted the circuit's prior ruling in *Mason v. Scully*, 16 F.3d 38 (2d Cir. 1994), in which it had condemned the same

---

[11] *Bruton* also contemplates that some evidence may be "equivalent in the jury's mind" to testimony and therefore the jury "might improperly infer both that the statement had been made and that it was true." *Bruton v. United States*, 391 U.S. 123, 127 (1968) (quoting *Douglas v. Alabama*, 380 U.S. 415, 419 (1965)). A statement that, after redaction, still inculpates a codefendant by implication violates *Bruton* as much, or even more, as one that remains unredacted. *Gray v. Maryland,* 523 U.S. 185, 192-93 (1998).

tactic based on an exchange that is remarkably similar to the testimony about which the defendant complains in this case:

> Q: And, after the lineup [in which [the victim] identified [a coconspirator]], was a conversation held with [that coconspirator]? This is a yes or no question.
>
> A: Yes.
>
> Q: And, after this conversation with [the coconspirator], were you looking for somebody?
>
> A: Yes I was.
>
> Q: And, who were you looking for?
>
> A: [Defendant].

*Id*. at 40; *see also* 303 F.3d at 249.

The state employed the same tactic in this case, asking O'Brien questions that implied that he took actions to investigate Williams as the result of information inculpating Williams when he interviewed Eric and Higgins. And, again, removing any doubt about the purpose of that testimony, the state argued that inference during its rebuttal closing argument, reminding the jurors that "after they talk to Eric Williams again, Detective O'Brien went and got himself a picture, and who did he get a picture of? Before he had the statements of Ricardo Garr and Carl Mays, he got a picture of [Jessie Williams]." Resp. Ex. I at 87. The prosecutor may as well have said: "When O'Brien talked to Eric Williams, Eric told him that Jessie Williams was involved in the robbery." For purposes of hearsay and Confrontation Clause analysis, the two statements are the same.

Because the course of the police investigation of the robbery/murder for which Williams was tried had no relevance in the case, and because the state plainly presented the evidence concerning O'Brien's interviews for the purpose of convincing the jury that the police had

information implicating Williams in the crime that was independent of the information provided by "the con crew" who testified at trial, the conclusion by the state appellate court that the state offered that evidence for a purpose other than establishing the truth of what Eric and Higgins impliedly told O'Brien—namely, that Williams was involved in the crime—is clearly unreasonable and therefore is entitled to no deference. This court concludes that that the testimony was offered for the truth of statements made to O'Brien by Eric and Higgins—namely, to prove that Williams was involved in the robbery of Garr, Mays, and Mersier. As such, it was hearsay. And because it was *testimonial* hearsay, its use at trial was barred by the Sixth Amendment, as set forth by the United States Supreme Court in *Crawford*.[12]

### B. Harmless Error

Toward the end of its opinion on the Confrontation Clause issue, the state court of appeals conducted a brief harmless error analysis: "even if we were to hold that the admission of Detective O'Brien's testimony, and the prosecutorial comments thereon, were error, any such

_____

[12] *Smith v. McKee*, 598 F.3d 374, 387 (7th Cir. 2010) does not compel a different conclusion. In *McKee*, the Seventh Circuit addressed a Confrontation Clause claim similar to that advanced by Williams. The petitioner claimed that the state had elicited testimony from a detective that led to the inference that a codefendant had made out-of-court statements implicating the petitioner in a shooting. In discussing the claim, the court of appeals expressed doubt whether the detective's statements "were hearsay at all," *id.* at 387, because the testimony had been offered to explain his course of conduct. It acknowledged that the state had "pushed the boundary of hearsay" by expressly arguing that the jury should infer that the codefendant implicated the petitioner in the shooting but observed that "determining when the line has been crossed, such that an officer's testimony about his course of conduct becomes hearsay, is a somewhat murky area of the law." *Id.* The court therefore declined to say that "the decision to allow this testimony and the statements of the prosecutor was a clearly erroneous application of settled Supreme Court precedent" that would permit the grant of the habeas petition. These musings were equivocal and in any event dicta. Further, they treat what the Seventh Circuit has clearly said is a fact question—for what purpose were out-of-court statements introduced—as a question of constitutional law. See *Jones,* 635 F.3d at 1042. As a fact question, the issue is whether there is clear and convincing evidence that the statements were offered for their truth. For the reasons discussed, this Court concludes that there is.

error was harmless given the overwhelming evidence against defendant." *Williams*, 2011 WL

9548458, at *10.[13] Under *Brecht v. Abrahamson*, habeas relief is proper only if the error "had

substantial and injurious effect or influence in determining the jury's verdict." *Brecht v.

Abrahamson*, 507 U.S. 619, 623 (1993). This test subsumes the requirements of AEDPA, such

that "a federal court may not award habeas relief under § 2254 unless *the harmlessness

determination itself* was unreasonable. And a state-court decision is not unreasonable if

fairminded jurists could disagree on its correctness." *Davis v. Ayala*, 135 S. Ct. 2187, 2199

(2015) (internal quotation marks and citations omitted). Williams must therefore show that the

state court's conclusion that any Confrontation Clause error during his trial was harmless was

itself "so lacking in justification that there was an error well understood and comprehended in

existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562

U.S. 86, 103 (2011).

The state presented abundant evidence of Williams' participation in the robbery of Garr,

Mays, and Mersier. Each of the two surviving robbery victims, who were in the close quarters of

a van when the robbery and murder occurred, testified that Williams was present and involved in

the armed robbery; each testified consistently that Williams had opened the rear door on the

passenger side and had taken money from Mersier. One of those victims identified Williams by

photo array just two days after the shooting; the other identified Williams in a lineup shortly after

---

[13] The state appellate court also suggested that any Confrontation Clause violation was harmless because the jury was told that closing arguments were not evidence. *Williams* at *10. That statement reflects an unreasonable misunderstanding of Williams' argument. Williams was not arguing that the prosecutor's statements mischaracterized the testimony presented at trial. Rather, Williams was arguing that the prosecutor's statements demonstrated that O'Brien's testimony (which was certainly evidence for the jury) was functioning as hearsay to prove the truth of the matter asserted by implication. Accordingly, that rationale is not entitled to AEDPA deference. Nevertheless, as discussed further, the strength of the other evidence presented makes it clear that the state court's harmless error analysis was not unreasonable in any event.

Williams' arrest. Diane Perkins, who had been involved in the money order scheme earlier that day, saw Williams repeatedly on the day of the murder including during the encounter in which the victim was shot. A police officer (Horton) testified that he saw a man with a physical description similar to Williams near the van before he ran away. A palm print matching Williams' was lifted from the side of the van where the murder took place. The palm print was critical corroborating evidence that Williams had opened the back door of the van during the robbery. The prosecution discussed the print as a type of physical evidence that did not depend on the witnesses' credibility during closing arguments. *See* Resp. Ex. I at 36, 49. Williams did not testify, but his counsel asserted that he had not taken part in the robbery and that the palm print could not be dated (and thus could have been left at another time). *See* Resp. Ex. E at 34; Resp. Ex. I. at 53. Mays, however, testified that the doors on the van had already been open during the recruitment conversation with Eric and Williams, and that Williams had opened the side door during the robbery attempt. Resp. Ex. E at 63, 73. Garr similarly testified that Williams had opened the side door. *See* Resp. Ex. G at 11. Thus, the palm print provided strong corroborating evidence that Williams had been involved in the robbery because he would not otherwise have touched the van. *See* Resp. Ex. I at 78-79.

Against the weight of this compelling evidence, O'Brien's reference to Williams being implicated by his co-defendants could not have had a substantial effect in determining the jury's verdict. This is not a case in which that evidence was needed to shore up the absence of admissible evidence, or where the out-of-court statements played a substantial role in the trial. In the context of harmless error analysis, it is relevant that the specific substance of the statements was not elicited in the testimony; the jury did not learn any specifics about Williams' participation from O'Brien. Further, the evidence was but a small part of the government's case;

it was presented through only one witness, O'Brien, whose testimony about his interviews of Eric and Higgins was brief. The prosecution did not even address that testimony in its initial closing argument, and did not dwell on it for very long during its rebuttal argument. This is not to say that the evidence was insignificant or trivial, only that it was substantially outweighed by the admissible evidence presented against Williams. Although co-defendant implication can be compelling evidence, in this case, given its brevity and relatively generic quality, it pales in significance to the other explicit, detailed, and credible testimony and evidence that was also admitted.

*Jones v. Basinger* provides some insight into the type of pervasive error necessary to satisfy the *Brecht* standard. There, the Seventh Circuit found the testimony was not harmless because there was no physical evidence and no eyewitness testimony other than one questionable witness who was testifying under a plea agreement that eliminated four murder charges against him. *Jones*, 635 F.3d at 1053-1054. Further, in *Jones*, the testimony at issue "provided a detailed but double-hearsay account of the crimes" that, unlike the offending testimony here, was not ambiguous as to the details of the defendant's participation in the crimes alleged. Similarly, in *McCarley v. Kelly*, the Sixth Circuit found a Confrontation Clause violation a harmful error when the statements were a "keystone holding the arch of the State's case together" and contained the only eyewitness identification of the perpetrator. *McCarley v. Kelly*, 801 F.3d 652, 667 (6th Cir. 2015). *See also Dorchy v. Jones*, 398 F.3d 783, 791 (6th Cir. 2005) (error not harmless when *Crawford* violating testimony was the only remaining properly admitted eyewitness account).

In marked contrast, O'Brien's brief statements can hardly be said to have been the keystone of the prosecution's case against Williams when that case also included the testimony

of several eyewitnesses and corroborating forensic evidence placing Williams at the scene. Other courts have found Crawford violations to be harmless under similar circumstances. *See, e.g.*, *Mustari v. Pfister*, No. 12 C 9455, 2014 WL 793092, at *11 (N.D. Ill. Feb. 27, 2014); *Johnson v. Lamas*, 850 F.3d 119, 134 (3d Cir. 2017) (harmless error where erroneously admitted identification could reasonably be considered cumulative in light of two other witness identifications, even where those other witnesses were "significantly impeached"); *Watson v. Ducart*, No. CV1402180JLSAFM, 2015 WL 9690314, at *19 (C.D. Cal. Aug. 27, 2015), *report and recommendation adopted*, No. CV1402180JLSAFM, 2016 WL 126727 (C.D. Cal. Jan. 11, 2016) (four eyewitnesses and video evidence sufficient to render *Crawford* violation harmless); *Mendez v. Graham*, No. 11-CV-5492 ARR, 2012 WL 6594456, at *20 (E.D.N.Y. Dec. 18, 2012) (harmless error where State's case was "not especially strong" but challenged evidence was not relied on in prosecutor's summation and was largely cumulative of other testimony).

Given the strength of the other evidence admitted against Williams, there can be little doubt that Williams would have been convicted regardless of the introduction or comment on O'Brien's testimony—but more to the point, certainly it is not beyond reasonable argument that he would have been. Williams cannot, then, establish that the state appellate court's harmless error determination was "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Accordingly, his petition must be denied notwithstanding the constitutional error that occurred during his trial.

### C. Certificate of Appealability

In order for a certificate of appealability to be properly issued, the Court must find a "substantial showing of the denial of a constitutional right" which requires a "showing that

reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner." *Slack v. McDaniel*, 529 U.S. 473, 483-484 (2000); *see also* 28 U. S. C. §2253(c)(2). Here, although this Court concludes that the state court violated Williams' Sixth Amendment right to confront witnesses against him, the state appellate court's determination that the error was harmless in light of the weight of the other evidence properly admitted at trial cannot be said to have been objectively unreasonable and reasonable jurists could not debate that the petition should have been resolved in a different manner due to the plain harmlessness of the error. Accordingly, no certificate of appealability will issue. If the petitioner seeks to appeal this ruling, he must seek a certificate of appealability from the Court of Appeals.

\* \* \* \* \*

For the reasons stated above, the Court denies Williams' petition for a writ of habeas corpus and declines to issue and certificate of appealability.

Dated: April 20, 2017

John J. Tharp, Jr.
United States District Judge